# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION AND
ITS AFFILIATED LOCAL UNION NO. 7-0148,

                Plaintiffs,

v.                                               Case No. 06-C-1188

GRAPHIC PACKAGING INTERNATIONAL, INC.,

                Defendant.

## MEMORANDUM DECISION AND ORDER

Plaintiffs, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and its affiliated Local Union No. 7-0148 (collectively, "the Union") filed this action to vacate an arbitration award disposing of a grievance that arose under its collective bargaining agreement with defendant Graphic Packaging International, Inc. ("the Company"). In an award issued on August 22, 2006, Arbitrator Andrew Roberts determined that the Company did not violate a 2004-2008 collective bargaining agreement (CBA) when it terminated Thomas Reinke on January 20, 2005. The Union claims that the award does not draw its essence from the current CBA and should therefore be vacated.[1] Federal

---

[1] The Union also argues that the award should be vacated because it violates public policy. To the extent this argument differs from the Union's contention that the award does not draw its essence from the CBA, it is undeveloped and falls far short of the showing required to vacate an award on public policy grounds. *See W.R. Grace v. Local Union 759*, 461 U.S. 757, 766 (1983).

jurisdiction exists under Section 301 of the Labor Management Relations Act (LMRA), as amended, 29 U.S.C. § 185, and 28 U.S.C. § 1337(a). Both parties have moved for summary judgment and, in addition, the Company has filed a motion to strike and for sanctions pursuant to Fed. R. Civ. P. 11. For the reasons that follow, the Company's motion for summary judgment will be granted and the Union's motion will be denied. The Company's motion to strike and its motion for sanctions will also be denied.

## I. BACKGROUND[2]

The Company has plants in Menasha and Wausau, Wisconsin. Thomas Reinke, the grievant, began working at the Menasha plant in August 1974 and for the last several years he operated a Bobst, which is a machine that cuts paper to make boxes. On January 9, 2004, Reinke submitted a request for a Family Medical Leave of Absence, citing a serious health condition relating to back and leg pain. The Company granted the leave and Reinke commenced a "non occupational injury/illness" leave on January 20, 2004.

At the time Reinke commenced his leave, the parties were subject to a CBA that went into effect on May 1, 2000, and was set to expire on April 30, 2004 (the "Former Agreement"). Under that agreement, Section 15, the seniority clause, provided in pertinent part:

> *Section 15*
> *SENIORITY*
>
> *An Employee's seniority is broken when they:*
>
> . . .

---

[2]Unless otherwise stated, the facts are taken from the Arbitrator's decision, which is attached to the Union's complaint as Exhibit H.

2

> e. Are absent from work due to non-occupational injury/illness for more than twelve (12) consecutive months.

(DPFF 13; Award p. 2-3.)

While the grievant was on leave, the parties negotiated a successor labor agreement, which was executed on June 2, 2004. One of the negotiated and agreed-to modifications was a change in Section 15 to provide for a break in seniority when an employee was on leave for "non-occupational injury/illness for more than eighteen (18) consecutive months," instead of twelve months. This successive agreement was made retroactive to May 1, 2004.

On January 13, 2005, the Company sent Reinke the following letter, which Reinke received on January 18, 2005:

> The PACE union contract under which you began your leave specifically states, "An Employee's seniority is broken when they are absent from work due to non-occupational injury/illness for more than twelve (12) consecutive months."
>
> Your last day of work was January 19, 2004. You have been absent since that day due to a non-occupational injury/illness. As a result your seniority will be broken effective January 20, 2005 if you are not able to return to work.

(Award at 4.)

When Reinke did not return to work, on January 20, 2005, the Company sent him another letter which stated:

> The PACE union contract under which you began your leave specifically states, "An Employee's seniority is broken when they are absent from work due to non-occupational injury/illness for more than twelve (12) consecutive months."
>
> As was previously communicated, your last scheduled work day was January 19, 2004. You have been absent since that day due to a non-occupational injury/illness. As a result, your seniority has been broken effective January 20, 2005. Please consider this letter your notice of a break in seniority and the termination of your employment.

(*Id.*)

3

After Reinke's termination, the Union filed a grievance, claiming the grievant was "terminated unjustly," and was entitled to a full eighteen-month leave of absence. The grievance was appealed through the normal steps under the parties' existing collective bargaining agreement. Ultimately, on May 10, 2006, the dispute proceeded to an arbitration hearing before Arbitrator Andrew Roberts.

On August 22, 2006, Arbitrator Roberts rendered his award, denying the Union's grievance. The arbitrator found that the Company had granted Reinke a twelve-month leave in January of 2004, which at the time was the maximum allowed. Although the current CBA provided for up to eighteen consecutive months of leave before loss of seniority, the arbitrator found that Reinke's leave had not been extended. Based upon these findings, the arbitrator concluded that "[t]he Company acted appropriately and did not violate the 2004-2008 collective bargaining agreement when it terminated Reinke on January 20, 2005," and denied the grievance. (Ex. H at 16.)

The Union thereafter commenced this action to vacate the award.

## II. ANALYSIS

Before reaching the merits of the case, it is first necessary to address the Company's motion to strike the Affidavit of Thomas Reinke and multiple proposed findings of fact submitted by the Union in support of its motion for summary judgment. The Company correctly notes that review of an arbitration award is generally limited to the record before the arbitrator. As the Seventh Circuit has observed, "[t]he long-established federal policy of settling labor disputes by arbitration would be seriously undermined if parties kept available

4

information from the arbitrator and then attempted to use the information as a defense to compliance with an adverse award." *Chicago Newspaper Guild v. Field Enterprises, Inc.*, 747 F.2d 1153, 1157 (7th Cir.1984). Hence, the Union may not supplement the record by offering new evidence in the form of an affidavit and then proposing additional factual findings based on such evidence. Its effort to do so will be disregarded by the Court.[3]

Rather than simply make the point that the record may not be so expanded and urge the court to reject the Union's additional facts in its brief in reply, the Company has filed a separate motion to strike which, in turn, has generated another round of briefing by the parties. The Seventh Circuit, particularly Chief Judge Easterbrook, has recently criticized the filing of motions to strike portions of briefs filed on appeal. *See Custom Vehicles, Inc. v. Forest River, Inc.* 464 F.3d 725 (7th Cir. 2006) (Easterbrook, J., in chambers); *Redwood v. Dobson*, 476 F.3d 462, 471 (7th Cir. 2007). Noting the absence of authority for such motions in the federal rules and case law, Chief Judge Easterbrook observed in *Custom Vehicles* that motions to strike portions of briefs essentially call upon the court to engage in the time-consuming task of editing the opposing party's brief by reading a separate series of briefs on the issue and then removing those portions of the challenged brief that are not properly supported in the record. 464 F.3d at 726-27. The proper way to contest the opposing party's statement of facts, the Court noted,

---

[3]Most of the proposed findings that are the target of the Company's motion to strike are based on the CBA which was clearly part of the record before the arbitrator. Other facts introduced by the Union, however, were not part of the record. For example, Reinke states in his affidavit that the leave granted by the Company in January of 2004 was for six months and that in July 2004 he was granted additional leave with an unspecified end date. (Reinke Aff. ¶¶ 12, 13.) He also notes that the Company permitted him paid vacation pursuant to the terms of the new agreement during five weeks during the time he was on leave. (*Id.* ¶ 15.) The Union concedes these facts were not in the record before the arbitrator. (Br. In Opp. To Mot. To Strike at 4.)

5

is a brief in response or reply, not a motion to strike. *Id.* at 726. "Motions to strike disserve the interest of judicial economy. The aggravation comes at an unacceptable cost in judicial time." *Redwood,* 476 F.3d at 471.

Although Chief Judge Easterbrook's criticisms in *Custom Vehicles* and *Redwood* were addressed to motions to strike portions of appellate briefs, they apply just as well to the Company's motion to strike filed in this case. It is true that, unlike the Federal Rules of Appellate Procedure, the Federal Rules of Civil Procedure actually authorize such a motion. *See* Fed. R. Civ. P. 12(f). However, a motion to strike under Rule 12(f) is addressed to the pleadings, as opposed to affidavits and proposed findings of fact, and applies to "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The rule has no application here. Instead of narrowing the issues and allowing for a more expeditious resolution of the motion for summary judgment, motions to strike generate another round of briefs that the court is required to read before it can reach the merits of the underlying dispute. In this way, they also allow parties to circumvent the page limitations of briefs by providing them an opportunity to present what should be part of the argument for or against granting the pending motion in an entirely separate round of briefing. Here, I see no reason why the Company's argument that the court should disregard the Union's effort to expand the record was not simply included in its reply. Since a motion to strike was neither required, nor appropriate under the circumstances, I conclude that it should be denied.

Turning to the merits, I begin with the recognition that judicial review of an arbitration award under a collective bargaining agreement is extremely limited. In the words of the Supreme Court,

> Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement. We recently reiterated that if an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision. It is only when the arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice that his decision may be unenforceable. When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's improvident, even silly, factfinding does not provide a basis for a reviewing court to refuse to enforce the award.

*Major League Ballplayers Ass'n. v. Garvey*, 532 U.S. 504, 509 (2001) (quotations and citations omitted).

The reason for this narrow, almost negligible, standard of review is that is what the parties to the agreement have bargained for. "Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." *United Paperworkers v. Misco*, 484 U.S. 29, 37-38 (1987); *see also Chicago Typographical Union v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1505 (7th Cir.1991) ("An agreement to submit a dispute over the interpretation of a labor or other contract to arbitration is a contractual commitment to abide by the arbitrator's interpretation."). Thus, so long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, his decision cannot be overturned. *Misco,* 484 U.S. at 38. "The court is forbidden to substitute its own interpretation even if convinced that the arbitrator's interpretation was not only wrong, but plainly wrong." *Chicago Typographical Union*, 935 F.2d at 1505.

7

Case 1:06-cv-01188-WCG   Filed 08/04/07   Page 7 of 17   Document 47

On the other hand, as the Union points out, judicial review of arbitration awards is not intended to be illusory. The arbitrator cannot ignore the clear and unambiguous language of the agreement. *Tootsie Roll Indus., Inc. v. Local Union # 1*, 832 F.2d 81 (7th Cir.1987). The arbitrator's award "is legitimate only so long as it draws its essence from the collective bargaining agreement." *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). "When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." *Id.* In applying this standard, the Seventh Circuit has observed that when the arbitrator bases his award "on some body of thought, or feeling, or policy, or law that is outside the contract (and not incorporated in it by reference) . . . the award can be said not to draw its essence from the [CBA]." *Dexter Axle Co. v. Int'l Assoc. of Machinists*, 418 F.3d 762, 768 (7th Cir.2005) (internal quotation omitted).

In this case, the Union makes a strong argument that the arbitrator failed to base his decision on the language of the agreement he was called upon to apply. Reinke was terminated on January 20, 2005, when the Company determined that his seniority was broken because he had been "absent from work due to a non-occupational injury/illness for more the twelve (12) consecutive months." (Ex. H at 3.) Once his seniority was broken, Reinke was considered a probationary employee under the agreement whom the Company was free to terminate for any reason, or no reason at all. (Reinke Aff. Ex. B at 12.) Thus, if the Company's determination that Reinke's seniority had been broken was correct, it was entitled under the CBA to terminate his employment. Section 15 of the CBA that was in effect at the time of Reinke's termination, however, provided that employees' seniority is broken "when they . . . [a]re absent from work due to non-occupational injury/illness for more than eighteen (18) consecutive months." (*Id.*

8

at 13.) The arbitrator expressly found that the language of Section 15 was "reasonably clear" and rejected the Company's argument that he should use past practice to construe it. (Ex. H at 15-16.) And it is undisputed that at the time of his termination, Reinke had not been absent from work for more than eighteen consecutive months. It therefore follows that if the arbitrator had applied Section 15 of the current CBA, he would have concluded that the Company was wrong and that Reinke's seniority had not been broken. And if that were true, then the Company's termination of Reinke was improper.

The arbitrator avoided this result by not applying Section 15 of the current CBA. Instead, it appears from his analysis that the arbitrator concluded that Reinke had been given a twelve-month leave and that he was terminated for his failure to return to work thereafter. The arbitrator began his brief "discussion" of the issue by considering Reinke's request for leave:

> Reinke requested, and was approved for, a leave under the 2000-2004 collective bargaining agreement. There was only a twelve-month leave then available. Nothing more was provided. Reinke was therefore on an approved twelve-month leave.

(Ex. H at 14-15.) The arbitrator then proceeded to note that there was no evidence, either in the language of the 2004-2008 agreement or in the negotiations that preceded it, that the parties intended to extend Reinke's leave. (Ex. H at 15.) Since the original twelve-month leave had never been extended, and Reinke had not returned to work when it expired, the arbitrator seems to have concluded that the Company was entitled to terminate his employment for that reason alone.

But the Company never claimed that it had terminated Reinke's employment because he failed to return to work after his leave expired. Having determined that he lost his seniority,

9

the Company was not required to provide a reason for terminating him, and it did not do so. It simply notified him of the break in his seniority and that his employment was terminated. (Ex. H at 3.) Thus, the only issue before the arbitrator was whether the Company was correct in its determination that Reinke's seniority had been broken. And instead of looking to the agreement to decide this issue, the arbitrator decided another issue that no one had raised. The result is an award that the Union claims is not only wrong, but one that fails to "draw its essence from the collective bargaining agreement." *Enterprise Wheel and Car Corp.*, 363 U.S. at 597).

As the above cases demonstrate, however, the *Enterprise Wheel and Car* standard is not met by showing that the arbitrator's decision is wrong, or even plainly wrong. "When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's improvident, even silly, factfinding does not provide a basis for a reviewing court to refuse to enforce the award." *Major League Ballplayers Ass'n.*, 532 U.S. at 509. For a court to vacate an arbitration award under a collective bargaining agreement, there must be a showing of fraud or a conflict of interest on the part of the arbitrator, or at least a willful disregard of the contract. *Chicago Typographical*, 935 F.2d at 1505-06. Nothing of that nature has been shown here. At most, the Union has shown that the arbitrator erroneously applied that agreement, not that he willfully refused to apply it at all. An arbitrator's determination that a particular provision of an agreement does not apply to the specific issue before him is not the same as a refusal to apply the agreement at all.

*Chicago Typographical Union v. Chicago Sun-Times, Inc.*, is particularly helpful in explaining the distinction. In *Chicago Typographical*, the employer unilaterally changed some

10

of the terms and conditions of employment based on certain concessions the Union had granted to a competitor. The employer claimed it was entitled to do so under a "most favored nations" clause in Section 7(a) of the Main Agreement, which entitled the employer to any concessions that the Union granted to the competitor. The Union filed a grievance, however, claiming that some of the changes made by the employer violated a Supplemental Agreement between the parties. Section 7(b) of the Main Agreement stated the parties' understanding that "the provisions of the Supplemental Agreement of 1975 are neither superseded, affected, or supplanted by the language of" section 7(a). The changes it was contesting, the Union argued, fell within an exception to the "most favored nations" clause. The arbitrator rejected the Union's argument in a single sentence: "Nor is there need to determine the application of Section 7(b) to the circumstances of this case." 935 F.2d at 1503. When the arbitrator refused to provide a more complete explanation, the Union filed suit to vacate the award.

Notwithstanding the arbitrator's failure to explain why he thought it unnecessary to apply Section 7(b), the Court refused to vacate the award and, instead, imposed sanctions on the Union for pursuing a frivolous appeal. In reaching this conclusion, Judge Posner, writing for the majority, acknowledged that the arbitrator's opinion was "not a reasoned statement of the grounds for its result." *Id.* at 1505. But he found it was "still an interpretation of the contract." *Id.* The Court explained:

> [The arbitrator] did not say, 'I shall ignore section 7(b) because it contravenes my notions of sound labor relations.' He believed section 7(b) to be inapplicable, but there is nothing to suggest that he arrived at this belief other than by interpreting the Main Agreement.

*Id.* at 1506. This is not to say that the award must be enforced unless the arbitrator expressly states that he is ignoring the agreement. The Court acknowledged in *Chicago Typographical*

11

that there are cases where, even though the arbitrator does not say that he is disregarding the contract, the absence of any "possible interpretive route to the award" gives rise to a sufficiently strong inference that he did so to justify setting aside the award. *Id.* at 1506. "The zanier the award, the less plausible it becomes to ascribe it to a mere error in interpretation rather than to a willful disregard of the contract." *Id.* But the Court cautioned against conflating erroneous interpretation by the arbitrator with willful disregard of the contract, noting that "[a]rbitrators are not required to write opinions, any more than juries," and that subjecting their opinions to "beady-eyed scrutiny" might discourage them from writing opinions at all, which would likely result in less reasoned decisions. *Id.* In sum, the Court concluded that "since arbitrators' interpretations must be accepted even when erroneous, it cannot be correct that arbitrators are required to write good opinions." *Id.* So long as there exists some "possible interpretive route to the award," *id.*, it may not be set aside.

So what "possible interpretive route" is there to the conclusion that the change in the current CBA as to the amount of time an employee can be absent due to non-occupational injury/illness does not apply to employees who began their leave under the previous agreement? Certainly, not the one taken by the arbitrator in this case. As noted above, the arbitrator failed to even address the issue in his analysis. But even this is not fatal. The arbitrator's failure to set forth the interpretive route "is not a defect for which a court asked to set aside the award can provide a remedy." *Id.* Instead, the court must look for itself to determine whether a possible interpretive route to the award exists. *Id.*

A possible route becomes apparent if we suppose that instead of increasing the length of time an employee could be continuously absent before losing his seniority, the new

12

agreement shortened it. Suppose, for example, that instead of increasing the amount of time an employee could be absent due to non-occupational injury/illness to eighteen consecutive months, the new agreement decreased it to six months. To apply the change to employees who had been on an approved leave for more than six months, but less than twelve, when the new contract became effective would subject them to immediate termination without notice. This was precisely the situation the employees faced in an arbitration of a grievance brought three years earlier by an employee at the Company's Kalamazoo facility. *See Graphic Packaging Corp.*, AAA Case No. 54 300 00524 03 (Aff. of Thomas R. Revnew, Ex. D, App. A).

In *Graphic Packaging*, the new agreement provided that if an employee was unable to return to full-time active employment following a twenty-four consecutive month absence for non-work related injury/illness, or a thirty-six consecutive month absence for a work related injury/illness, the employee would be discharged and his seniority and benefits would end. Apparently, there had been no limit on the length of time employees could be absent on approved leave under the previous agreement. The five employee-grievants had all been on approved medical or work injury/illness related leaves when the new contract took effect in January of 2003. In February, 2003, all five employees received letters from the Company notifying them of their discharge pursuant to the new contract. The Union filed a grievance on behalf of the employees, and the matter proceeded to arbitration where the arbitrator found that the new provision did not apply to employees who were on medical leave at the time the new contract took effect.

In reaching his conclusion that the new provision did not apply to employees who were on medical leave when the new contract became effective, the arbitrator in *Graphic Packaging*

13

first noted that the contract was silent as to whether the new language would apply to those employees currently on leave and, thus, was ambiguous in that respect and in need of interpretation. *Id.* at 7. He then turned to two rules that govern contract interpretation. The first was the standard of "good faith" or reasonableness under the circumstances." *Id.* at 8. Under this rule, the arbitrator noted, "[a]n interpretation giving a reasonable meaning to contractual terms is preferred over an interpretation that provides an unreasonable, harsh, absurd, or nonsensical result . . . ." *Id.* (*quoting Common Law of the Workplace*, §2.1, at 64 (NAA-BNA, St. Antoine Ed. 1998)). The second rule of interpretation cited by the arbitrator in *Graphic Packaging* was "[o]ne of the so-called 'ancient interpretive maxims' [which] is to construe language against the drafter." *Id.* (*quoting Common Law of the Workplace* , §2.6, at 70). Both rules, the arbitrator concluded, supported the Union's interpretation that the new language did not apply to employees already on leave when it became effective. The Company's interpretation led to the harsh result that the employees already on leave were subject to immediate termination without notice. And since the Company drafted the language of the new provision, it had the opportunity to say exactly what it was proposing, especially if it intended to take the position that the proposed language would entitle it to immediately terminate the employment of five employees. *Id.* at 8-9. Because the Company failed to make clear such an intent, the arbitrator adopted the Union's interpretation that the new provision did not apply to employees who were on leave when the new contract became effective and ordered their immediate reinstatement. *Id.* at 9.

      The same analysis supports the Company's interpretation here. In this case, the positions of the parties are reversed– it is the Union that argues that the new provision applies

14

to employees who were on medical leave at the time the new contract became effective and the Company that contends it does not. And unlike the earlier *Graphic Packaging* arbitration, application of the new contract to those who were on medical leave when it became effective would not subject them to immediate discharge since the new language increased the number of consecutive months they could be absent before losing their seniority. But it does not seem fair, or reasonable, to follow one rule when the change benefits the employee and a different rule when it benefits the Company. If a provision of a contract that limits the amount of time an employee can be on medical leave before being terminated does not apply to employees who are already on such leave when the contract takes effect, then consistency would seem to require that a provision of a new contract that increases the length of time the employee can be on leave would not apply either. Finally, unlike the earlier case, it was the Union that proposed the provision at issue here. If it intended that the new provision would apply to employees then on leave, it could have made that clear in its proposal. Because the Union drafted the disputed provision, the arbitrator would have been justified in construing the language against it.

Of course, this is not the analysis that the arbitrator set forth in reaching his award. As noted above, the arbitrator found that the language of Section 15 was reasonably clear and not in need of construction. But as *Chicago Typographical* makes clear, the question before a court called upon to vacate an arbitrator's award is not whether his decision is correct, or even reasonable. Absent fraud or a conflict of interest, the award must stand unless the arbitrator willfully refused to apply the contract. And no willful refusal can be found unless the arbitrator either expressly disregards the agreement or no possible interpretive route to it can be found. 935 F.2d at 1505-06. Here, there is no suggestion of fraud or a conflict of interest on the part

15

of the arbitrator, and he did not expressly disregard the agreement. Since a possible interpretive route to the award exists, I cannot infer that he willfully disregarded the agreement. I therefore conclude that the award draws its essence from the agreement and the request to vacate it must be denied.

There remains the issue of sanctions. The Company has filed a motion for sanctions pursuant to Fed. R. Civ. P. 11, claiming that the Union's challenge to the arbitration award is frivolous and clearly contrary to longstanding precedent. Noting that the Seventh Circuit has not hesitated to impose sanctions "[w]hen a party quibbles over an arbitrator's interpretation of a labor agreement" (Reply Mem. In Supp. of Mot. for Sanctions at 1), the Company contends sanctions are clearly appropriate here. The Company also claims that the Union's attempt to supplement the record with facts and evidence not presented to the arbitrator warrants further sanctions. I decline to award sanctions on either ground.

As is clear from the above discussion, I do not find that the decision of the arbitrator in this case was well-reasoned. In truth, I believe he failed to even address the issue raised in the grievance and instead decided an issue that was not before him. Although I have denied the Union's request to vacate the award, I have upheld the award on the basis of an analysis significantly different from that offered by the arbitrator. Under these circumstances, I do not find the Union's action frivolous within the meaning of Rule 11. And unlike the party who was sanctioned in *Chicago Typographical*, the Union did not advance a discredited standard for evaluating an arbitrator's award, or fail to recognize the existence of potentially dispositive precedent. 935 F.2d at 1507. Especially in light of the Seventh Circuit's decisions in *Tootsie Roll Industries, Inc. v. Local Union # 1*, 832 F.2d 81, and *Young Radiator Co. v. International*

16

*Union, U.A.W.*, 734 F.2d 321 (7th Cir.1984), each of which concluded that an arbitrator's award did not draw its essence from the agreement under circumstances not that far from those here, I cannot say that the Union's position in this case was so untenable as to warrant the imposition of sanctions.

With respect to the Union's attempt to supplement the record, the issue might be closer. As the Union acknowledged in its brief in opposition to the Company's motion to strike, several of its proposed findings of fact were not presented to the arbitrator. (Brief In Opp. To Mot. To Strike at 4.) The Union cited no authority that would support its effort to supplement the record in this manner. On the other hand, the Company elected to challenge the Union's action in a fashion that has itself been found sanctionable and that, in the words of Chief Judge Easterbrook, "disserve[s] the interest of judicial economy." *Redwood,* 476 F.3d at 471. Under these circumstances, I decline to impose sanctions on either party.

Accordingly, and for the reasons set forth above, the Company's motion for summary judgment is **GRANTED** and the Union's motion for summary judgment is **DENIED**. The Company's motion to strike and its motion for sanctions are likewise **DENIED**.

**SO ORDERED** this   3rd   day of August, 2007.

s/ William C. Griesbach
William C. Griesbach
United States District Judge
